# UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOYCE E. WALTERS,<br><br>       Plaintiff,<br><br>       v.<br><br>MICHAEL J. ASTRUE, Commissioner<br>of Social Security,<br><br>       Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

1:09cv0077 DLB

ORDER REGARDING PLAINTIFF'S
SOCIAL SECURITY COMPLAINT

## BACKGROUND

Plaintiff Joyce E. Walters ("Plaintiff") seeks judicial review of a final decision of the

Commissioner of Social Security ("Commissioner") denying her application for supplemental

security income ("SSI") pursuant to Title XVI of the Social Security Act.  The matter is currently

before the Court on the parties' briefs, which were submitted, without oral argument, to the

Honorable Dennis L. Beck, United States Magistrate Judge.[1]

## FACTS AND PRIOR PROCEEDINGS[2]

On February 18, 2005, Plaintiff protectively filed an application for SSI.  AR 106, 107-

09.  She alleged disability since January 6, 2005, due to pain in the lower neck and top of spine

---

[1] The parties consented to the jurisdiction of the Magistrate Judge for all purposes.

[2] References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

1

and a  blood clot in the left leg.  AR 107-09, 110-16.  After Plaintiff's application was denied

initially and on reconsideration, she requested a hearing before an Administrative Law Judge

("ALJ").  AR 60-67, 69-74, 75.  On June 29, 2007, ALJ Eve B. Godfrey held a hearing.  AR 27-

59.  ALJ Godfrey denied benefits on August 27, 2007.  AR 16-26.  The Appeals Council denied

review on October 29, 2008.  AR 5-8.

Hearing Testimony

ALJ Godfrey held a hearing on June 29, 2007, in Bakersfield, California.  AR 27-59.

Plaintiff appeared with her non-attorney representative, Diana Wade.  John Kilcher, a vocational

expert, and Dr. Justin Renaudin, a medical expert, also appeared and testified.  AR 29.

Plaintiff was 41 at the time of the hearing.  She has a 9th grade education.  AR 31.  She

last worked in January 2005 doing in home services.  Before that, she worked as a housekeeper

and a cashier.  AR 32.

After the date of alleged disability, Plaintiff had back and neck surgery.  AR 32-33.  She

had neck surgery in August 2005, but did not really have a good result from it.  The surgery made

her lower back "hurt real bad" and pinched off a nerve, but improved some of her neck problems.

She had a second surgery in October 2006.  The surgery unpinched the nerve, but she gets muscle

spasms in her leg if she sits or stands too long.  They said that it will get better.  AR 33.  The

muscle spasms just happen in her left leg two or three times a day.  It is her whole leg, from the

back of her buttocks to her foot.  It usually happens when she sits for more than an hour, but

occasionally it can happen after 20 minutes.  AR 33-34.

Plaintiff feels she cannot work because she is not able to sit for very long.  She takes a lot

of painkillers and spends most of her time in bed.  She gets up in the morning for a few minutes

and then usually goes back to bed for a couple hours.  If it is a good day, she gets up and does the

dishes or starts them and her boyfriend finishes them.  When she hurts, she gets "real mad."  AR

34-35.

Plaintiff takes Norcos, Somas, Robaxin and Lyrica.  The Norco is 10 vicodin, 325

milligrams acetaminophen.  She takes three a day.  She tries to take the Soma in the evening.

She tries not to take them in the day because they knock her out cold and she has to take care of

2

her 14-year-old son.  She lives with her son and her boyfriend.  Her boyfriend is the father of her son.  AR 35-36.  She takes Robaxin when she cannot take the Soma.  It is a light, lower dosage and has less effect.  She sometimes takes them three times a day.  She takes Lyrica if she can afford it.  AR 36.

Plaintiff testified that she does not take care of her 14-year-old son.  His dad "takes care of him mostly."  She helps out.  She starts the dishes or the laundry.  Her son takes care of himself now.  She disciplines and supports him.  She does not help him with his homework.  His father is self-employed, doing maintenance and yard work.  He does not have a company or employees.  He does not work full time.  AR 37.

Plaintiff does not drive.  She never has.  She smokes about half a pack a day.  She is 5'5" and weights about 186.  AR 37.

Plaintiff testified that she left a hospital when she was complaining of abdominal and urinary problems without getting a certain procedure.  She said she might have had kidney stones that day and could not handle just sitting there and went home.  She thought she went back the next day.  She has been to the hospital many times for kidney stones.  AR 38.

Plaintiff testified that she was never sent to vocational rehabilitation counseling or training of any nature.  She did not have job training.  She went to a parenting class at College Health to deal with her son because he has ADHD.  She went to the doctor and got a note saying that she could not make it to class so it was an excused absence.  AR 39-40.

In response to questions from her representative, Plaintiff testified that she has cramping in her legs and numbness in the left leg.  Before she had her neck surgery, she was complaining of very bad headaches.  The headaches were getting better after the neck surgery, but they got worse after she had her lower back surgery.  The doctor said it was probably from the nerves in there.  He wanted to give her some kind of shots, where they put three in your neck.  She wanted to wait and they changed her doctor to Tim Mensi.  The doctor said her leg takes a while to heal.  It has gotten a little bit better in the last few months.  She can sit for a little bit longer.  She still spends a lot of time in bed, probably 16 hours a day.  AR 41.  While in bed, she sleeps, lies there, and tosses and turns.  She does not "really have much problem sleeping."  AR 41.

Plaintiff steadily has been gaining weight.  She believed it was from inactivity.  She thought gaining weight also was side effect from Lyrica.  She spends a lot of time in bed and was sure that had something to do with it.  There is not really any type of activity that she does for enjoyment.  AR 42.

 In response to additional questions from the ALJ, Plaintiff testified that her son is not on benefits.  He takes medication that she has to monitor.  She makes sure that he takes it.  AR 43.

Medical expert, Dr. Renaudin, also responded to questions from the ALJ.  Dr. Renaudin testified that he had the opportunity to review all of Plaintiff's records.  In his opinion, she did not meet or equal a listing.  Dr. Renaudin thought she had two significant problems in the last couple of years.  She had cervical spondylosis operated on in August of '05 and she had an anterior cervical disc infusion.  She had a large lumbar disc on the left at L5-S1 operated on in October of '06.  She also has electrical evidence of mild bilateral or carpal tunnel syndrome.  She has headaches of an unclear genesis.  AR 44.

It appeared to Dr. Renaudin that Plaintiff had a successful result from the neck issue.  She still had some residual from the lumbar surgery, but it was quite a large disc.  Dr. Renaudin thought that she could continue to improve, but it was unsettling that the leg cramping and spasms had been going on for seven, almost eight months.  He would not rule out that they would improve.  Looking at the records, this was the kind of lumbar disc where clearly she needed surgery.  It customarily does reasonably well at a 80 percent confidence level.  He thought it was unsettling that she still had the spasms, but he did not think that it necessarily was going to be permanent.  AR 45.

Dr. Renaudin testified that in the two years and four months since February '05, there was no 12 month period when she was restricted to less than sedentary work.  She had two significant surgeries, but he did not think that she would be restricted to less than sedentary for 12 months.  AR 45-46.  He thought she would be able to do light work.  Based on the most recent RFC evaluation, she could stand up to six hours a day and/or walk up to six hours.  AR 46.  She was just examined 30, 40 days ago.  AR 47.

Dr. Renaudin also answered questions from Plaintiff's representative.  Dr. Renaudin testified that it was unsettling that the cramping had gone on for six, seven months post op speaking from the standpoint of a surgeon having done the procedure.  He did not feel that it meant "incontestably that she's doomed to having spasms for the rest of her life."  AR 47.  It was something that does not happen often, but happens occasionally.  AR 47.  Assuming Plaintiff's testimony was credible and she was having cramping and spasms, it would have some restriction on her ability to sit.  AR 47.  It would require getting up periodically or taking muscle relaxants.  AR 47-48.  During an eight-hour day, she would have to get up every hour for approximately five to ten minutes.  AR 48.

Dr. Renaudin testified that the muscle relaxers that Plaintiff takes can cause the type of sedation that she describes.  AR 48-49.  He would recommend the Robaxin.  He thought that her treating physician's opinion was accurate when he gave it.  AR 50.

In response to additional questions from the ALJ, Dr. Renaudin testified that Dr. Mensi listed bilateral occipital nerve block scheduled to rule out occipital neuralgia.  Dr. Renaudin indicated that what he was saying is if one injects the occipital nerves and gets relief of the pain, maybe occipital neuralgia is the correct diagnosis.  AR 51.  Plaintiff testified it was never done. AR 51.  Dr. Renaudin also reported that there was no functional significance to the absence of a left ankle jerk.  AR 52.

The VE, John Kilcher, also testified.  He categorized Plaintiff's past relevant work as a housekeeper, DOT code 301.474-010, as medium level, semi-skilled, SVP of 3.  AR 52-53.  Her work as a maid, DOT code 323.687-014, was classified as light, unskilled, SVP of 2.  Her job as a Cashier II, DOT code 211.461-010, also was classified at light, unskilled, SVP of 2.  AR 53.

For the first hypothetical, the ALJ asked the VE to assume an individual who could sit for up to 20 minutes at a time, stand for 15 minutes at a time, walk for a quarter mile and when the person changes positions, for walking, has to be three minutes.  The individual also needs a position in which she can change, including standing and walking, and take an unscheduled break.  The VE testified that this individual would not be able to do any of the past relevant work or any other work.  AR 53.

For the second hypothetical, the ALJ asked the VE to assume a person who could sit two hours at a time, stand up to two hours at a time, walk one hour at a time, sit for a total of six out of eight hours, stand for between four and five hours out of eight, walk four out of eight, walk 1/4 to ½ mile, and only use the left foot frequently.  This person occasionally could climb, but frequently could do other postural activities, occasionally could be exposed to unprotected heights and vibrations, could frequently be exposed to moving mechanical parts, and could continuously be exposed to humidity and wetness.  AR 54.  The VE testified that these restrictions would rule out past work, but there would be a little bit less than a full range of light work available.  There would be jobs as a Small Products Assembler, DOT code 706.684-022, which is light, unskilled, SVP of 2.  Taking into consideration the total time to sit and stand, the VE reduced the number of jobs, with approximately 70,000 jobs in the U.S. economy.  AR 54-55.  The VE also testified that there would be jobs as Hand Packagers.  An example would be Nut and Bolt Packer, DOT code 929.587-010, which is light, unskilled, SVP of 2.  By reducing it, there would be approximately 145,000 jobs in the U.S. economy.  AR 55.

For the third hypothetical, the individual could sit for six out of eight hours in a day.  After an hour, the individual would need to be able to get up, stretch and walk around for no more than five minutes.  The individual would be able to stand and walk four out of eight hours, but only 30 minutes.  The VE testified that this individual could not do any of the past relevant jobs, but there would be other jobs.  The jobs that the VE had given for the previous hypothetical would be appropriate, but the VE would reduce them a "little more."  AR 55.

The VE also testified that there would be sedentary jobs classified as assemblers.  For example, there would be a Final Assembler, DOT code 713.687-018, which is classified as sedentary, unskilled, SVP of 2.  There would be approximately 500,000 jobs in the U.S. economy.  There would be jobs classified as Production Inspectors.  An example would be a Table Worker, DOT code 739.687-182, which is sedentary, unskilled, SVP of 2.  There would be approximately 200,000 jobs nationally.   The VE's testimony was consistent with the DOT.  AR 56.

In response to questions from Plaintiff's representative, the VE testified that if the person in hypothetical three would have to move around up to 10 minutes it would be "kind of iffy" if the person could do the two sedentary jobs.  AR 56.  The VE explained that normally with those type of jobs you don't have to be seated all the time.  In the assembler's job, after you get things assembled you usually move around and take them to another location, so it would give you the latitude to do that.  AR 56-57.

The VE indicated that these are unskilled jobs and are not high requirements for precision.  In assembly jobs, you have to work at a sustained pace.  If the person could not maintain expected production, then the person would be excluded.  The VE indicated that any time a person cannot keep up the standards of the company, then they would look on that unfavorably.  AR 57.  The VE testified that he uses one day a month as the employer tolerance for absenteeism per month for unskilled, non-professional work.  AR 58.  More than one day a month, the employee would not last very long.  AR 58.

Medical Record

X-rays of the cervical spine taken on November 9, 2004, revealed marked narrowing of the right C2-3, 3-4 and 5-6 intervertebral foramina and moderate narrowing of the right C4-5 intervertebral foramen.  There was decreased flexion in the mid cervical spine.  AR 204.

A January 13, 2005, MRI scan of the cervical spine showed straightening of the normal cervical lordosis and sclerosis in the facet joints on the left side at C4-5, mild-to-moderate bilateral foraminal stenosis at C5-6 and left sided foraminal stenosis at C4-5, mild canal stenosis with no cord compression and bilateral foraminal stenosis at C6-7.  AR 202.

On January 31, 2005, Plaintiff saw Robert Cross, PA-C, for complaints of hand and arm pain.  On examination, she had 4/5 strength in her upper extremities.  She was referred for a neurosurgery consult and prescribed Norco for pain.  AR 197.

On February 14, 2005, Plaintiff saw PA Cross for complaints of posterior C-spine pain radiating to the right side of her shoulder, lateral neck and chest.  She denied any weakness.  On examination, she had 4/5 strength in the upper extremities, with decreased range of motion secondary to pain in the C-spine.  PA Cross assessed her with cervical spine foraminal stenosis,

as seen on CT, posterior cervical spine pain and right upper anterior shoulder pain (burning).
She was given a trial of nortriptyline, a Medrol Dose Pak X1, and directed to continue taking
Norco and soma.  She was referred to a pain specialist.  AR 196.

On February 23, 2005, O. Leramo, M.D., completed a neurological consultation at the
request of Dr. Nadler.  Cervical examination revealed pain on extension of the neck and
tenderness to palpation of the cervical muscles.  On neurological examination, she was alert and
fully oriented.  Her gait was normal.  A sensory examination revealed hyperethesia bilaterally at
C7-8 dermatones.  Her motor function was normal and reflexes were symmetrical.  Dr. Leramo
diagnosed chronic post-traumatic neck pain, C4-5, C5-6 and C6-7 bilateral foraminal stenosis,
bilateral C7-8 radiculopathies and probable mechanical neck pain.  AR 218.  He recommended a
cervical spine myelogram with CT, an EMG and nerve conduction studies of the upper
extremities and a trial of Motrin.  Plaintiff was advised to avoid any heavy lifting, repetitive
bending and twisting of the neck.  AR 218.

On March 22, 2005, Plaintiff saw PA Cross for ongoing neck pain, nausea and headache.
She reported dropping common items with her right hand and having C-spine pain down to her
right arm and hand.  Plaintiff reported getting a fair amount of relief from cervical traction and
using Norco to control pain.  On examination, she had good range of motion of her head and
neck with no tremors.  She was able to move bilateral upper extremities with 4/5 strength slightly
decreased in her right hand and arm.  She had pain on palpation over the right trapezius area.
She was assessed with cervical spine foraminal stenosis, posterior cervical spine pain,
gastroesophageal reflux disease, nausea, vomiting and viral gastritis.  She was to continue
cervical spine traction and Norco.  She was directed to avoid lifting and carrying firewood.  Jack
Nadler, M.D., signed the treatment notes.  AR 194.

A CT Scan of the cervical spine on April 7, 2005, revealed straightening of normal
cervical adenosis, disc protrusion at C6-7 resulting in mild canal stenosis with no definite cord
compression and mild bilateral foraminal stenosis, mild right-sided foraminal stenosis at C2-3
and C5-6, and mild bilateral foraminal stenosis at C4-5.  AR 201.

Plaintiff underwent an electrodiagnostic study of both arms on April 8, 2005.  The study revealed evidence of mild bilateral carpal tunnel syndrome affecting sensory components.  There was a single CRD in the right paraspinal muscle, suggestive of right root irritation, but its clinical significance was questionable.  There was no sign of active/chronic denervation, plexopathy, clear radiculopathy or polyneuropathy of the arms.  AR 301-02.

On April 12, 2005, Plaintiff sought treatment from the Rural Health Clinic for kidney stones.  Plaintiff left the clinic, did not get the planned IVP done, and did not return to the clinic.  An attempt to call the Plaintiff revealed the wrong phone number.  AR 314.

On May 20, 2005, Plaintiff reported missing school–job training.  She was given a note for school.  AR 316.

On June 22, 2005, Plaintiff complained of continued neck pain.  AR 298.

On July 15, 2005, state agency medical consultant Lavanya Bobba, M.D., completed a Physical Residual Functional Capacity Assessment form.  Dr. Bobba opined that Plaintiff could lift and/or carry 20 pounds occasionally, 10 pounds frequently, could stand and/or walk about 6 hours in an 8-hour workday, could sit about 6 hours in an 8-hour workday and could push and/or pull without limitation.  AR 206.  She frequently could climb, balance, stoop, kneel and crouch.  She occasionally could crawl.  AR 207.  She should avoid frequent above shoulder level work and her right upper extremity handling could be done at light exertional level activities.  AR 208.  She had no visual, communicative or environmental limitations.  AR 208-09.

On August 9, 2005, Plaintiff complained of continued neck pain radiating down her bilateral upper extremities.  AR 296.

On August 10, 2005, Plaintiff underwent an anterior cervical diskectomy and fusion at C4-5, C5-6 and C6-C7.  AR 286.  She also had excision of an intervertebral disc, a bone graft and insertion of an interbody spinal fusion device.  AR 227, 286.

On August 16, 2005, Plaintiff requested an early refill of Norco because of pain.  She was not counting how many she was taking.  PA Cross told her to go to neurosurgery if she was in pain from surgery and instructed her to take medications exactly as prescribed.  AR 317.

On August 22, 2005, Plaintiff reported upper back, neck and arm pain.  She was prescribed Vicodin and Motrin.  AR 285.

On August 29, 2005, Plaintiff reported that her headaches had resolved since having surgery.  She had some upper bicep and right forearm discomfort and pain.  She also complained of muscle spasms in her upper back where the collar rests.  PA Cross noted this was common.  Plaintiff was status post anterior cervical diskectomy and fusion.  She was advised no bending, lifting, twisting or jumping, no activities, no turning the neck and no driving.  PA Cross indicated that he filled out her Department of Social Services disability form for three months of disability.  Dr. Nadler signed the treatment notes.  AR 318.

That same day, PA Cross completed a Short-Form Evaluation for Musculoskeletal Impairments.  Plaintiff's diagnoses included c-spine degenerative disk disease, c-spine pain and muscle spasms.  She had 100° flexion, 30° extension, and 30° right and left lateral range of motion in her spine.  PA Cross opined that her condition was temporary for another 3 months.  AR 254.

X-rays of the cervical spine taken on September 13, 2005, showed status post interbody fusion.  AR 284.

On September 19, 2005, Plaintiff complained of continued left arm pain and cramps, but was improving every day.  AR 283.  She was to wean off the c-collar and decrease Norco.  AR 283.

On October 14, 2005, Plaintiff complained of left lower extremity cramps, which were improving.  AR 322.

On November 29, 2005, Plaintiff was "doing well," but complained of spasms to her neck.  Her headaches had gone away.  She was to continue physical therapy, along with taking Motrin and Robaxin.  AR 281.

X-rays of the lumbar spine taken on January 11, 2006, showed marked straightening of lumbar lordosis, without other significant findings.  AR 334.

On January 10, 2006, Plaintiff complained of lower back pain.  She was assessed with degenerative disk disease of the lower spine and facet arthropathy.  AR 324.

On February 10, 2006, Plaintiff again complained of lower spine pain and muscle spasms. AR 326. She reported her left foot causing her to trip. She denied any neck or arm pain, having resolved since her ACDF. On examination, she had tenderness to palpation over the L-S spine. She had 4/5 strength in her bilateral lower extremities and her range of motion was good. PA Cross assessed her with lumbar spine pain, muscles spasms and lumbar spine degenerative discogenic disease. He ordered an MRI of the L-spine and prescribed SOMA for muscle spasms. She was directed to avoid bending, lifting, twisting, jumping or impact activities. Dr. Nadler signed the treatment notes. AR 327.

A MRI scan of the lumbar spine taken on March 6, 2006, showed a large left-sided disc protrusion at L5-S1 resulting in moderate to severe left-sided foraminal stenosis and indentation upon the left S1 nerve root and mild to moderate canal stenosis. It also revealed mild canal stenosis and bilateral foraminal stenosis at L4-L5. AR 263.

On March 15, 2006, Plaintiff complained of the same left leg pain. She had no new problems. AR 328. PA Cross directed her to stop or decrease smoking. AR 328.

On March 29, 2006, Plaintiff was continuing to improve. AR 280.

On May 5, 2006, Plaintiff complained of left leg pain since a fall. AR 330.

On May 17, 2006, Plaintiff saw Dr. Leramo for low back pain radiating to the left leg, accompanied by numbness and weakness. She reported falling backwards while moving some wood in April 2006. AR 273. Sensory examination revealed hyperesthesia, left L5-S1 dermatome. She had grade 5 motor function. Spinal examination revealed tenderness to palpation in the lumbosacral region. Left ankle jerk was absent. Dr. Leramo diagnosed post-traumatic low back pain, L5-S1 disk herniation, left side, and left L5-S1 radiculopathies. He recommended lumbar x-rays, EMG and nerve conduction studies of the lower extremities, a new MRI and prescribed Lyrica. AR 274. He opined that Plaintiff would eventually require surgery, consisting of L5 laminectomy and L5-S1 left microdiscectomy. AR 275.

An electrodiagnostic study of both legs completed on July 18, 2006, revealed normal findings, although she had absent left ankle jerk. AR 346.

An x-ray of the lumbar spine taken on July 26, 2006, revealed slight narrowing of L5-S1 intervertebral space.  There was no evidence of abnormal motion.  AR 364.

On October 4, 2006, Plaintiff complained to Dr. Leramo of continued lower back pain with left leg pain.  AR 351.

An x-ray taken October 6, 2006, showed an L5-S1 herniated disc.  AR 365.

On October 6, 2006, Plaintiff underwent an L5 laminectomy, and left L5-S1 microdiskectomy and decompression of the dura and the S1 nerve root and bilateral osteophytectomies and proximal foraminotomies.  AR 352-53.

On October 18, 2006, Plaintiff felt like she was improving.  AR 355.

On December 18, 2006, Plaintiff saw Jan Mensink, M.D.  Although Plaintiff's leg and lumbar pain had resolved, she complained of occipital headaches and bilateral hand numbness.  On examination, she had marked tenderness over the occipital nerves bilaterally and muscle spasm in the paravertebral cervical spine muscles.  She had moderately good range of the cervical spine.

Dr. Mensink diagnosed occipital neuralgia and cervical radicular symptoms.  Physical therapy and occipital nerve blocks were recommended.  She was prescribed Valium and Darvocet.  AR 356.

On December 29, 2006, Plaintiff reported that she was doing better.  AR 333.

An electrodiagnostic study of both arms completed on February 14, 2007, revealed abnormal findings.  There was evidence of bilateral carpal tunnel syndrome, which was mild in degree bilaterally, right more than left.  AR 358-62.

On February 14, 2007, Plaintiff saw Dr. Mensink and complained of continued headache, neck pain and left hand numbness.  Plaintiff noted that when she stopped Lyrica, her headaches started.  On examination, Plaintiff had very sharp palpable tenderness of the occipital nerves, left greater than right, with marked point tenderness of the occipital nerve insertions in the inner scalp.  She had some mild muscle spasms of the cervical muscles and good neck range of motion.  Dr. Mensink diagnosed occipital neuralgia headaches and bilateral carpal tunnel.

Plaintiff was to restart Lyrica and schedule occipital nerve blocks.  She was given a prescription for Norco.  AR 357.

On March 28, 2007, Dr. Mensink completed a Lumbar and Cervical Spine Residual Functional Capacity Questionnaire.  Dr. Mensink diagnosed Plaintiff with occipital neuralgia, bilateral carpal tunnel syndrome and status post lumbar laminectomy.  Her prognosis was moderate.  Plaintiff had chronic pain/paresthesia, with tenderness, muscle spasm and impaired sleep.  Dr. Mensink noted Plaintiff's left ankle jerk was absent.  Dr. Mensink opined that Plaintiff had significant limitation of motion and severe headache pain associated with impairment of the cervical spine.  She had bilateral occipital neuralgia and was scheduled for nerve blocks.  AR 257-58.

Dr. Mensink reported that Plaintiff had approximately 2-3 headaches per week, lasting 2-3 days at a time.  Her impairments lasted or could be expected to last at least twelve months.  She was not a malingerer, but emotional factors contributed to the severity of her symptoms and functional limitations.  Dr. Mensink further opined that Plaintiff was incapable of even "low stress" jobs because of severe headaches.  In a competitive work situation, Plaintiff could walk 1/4 mile without rest or severe pain.  She could sit for 20 minutes and stand for 15 minutes at one time.  It was unknown how long she could sit and stand/walk total in an 8-hour working day. She would need to include periods of walking during an 8-hour day.  AR 260.  She would need a job that permitted shifting position at will and would need to take unscheduled breaks.  Dr. Mensink did not know how often this would happen, but noted that Plaintiff spends most of her time lying down.  AR 261.  Plaintiff likely would be absent from work more than four days per month.  Dr. Mensink did not think Plaintiff could work in a job that would require 8 hours a day, 5 days a week with regular breaks and a one hour lunch.  AR 262.

On May 18, 2007, Jonathan M. Gurdin, M.D., completed a consultative orthopedic evaluation.  Plaintiff complained of left leg pain and neck pain with headaches.  On physical examination, Plaintiff appeared to show a somewhat exaggerated pain response.  AR 338.  She walked with a left-sided antalgic limp, "which may have been somewhat exaggerated."  AR 339. She was able to walk on the toes and heel of the right leg, but was unwilling to attempt on the left

leg due to left thigh pain.  She showed somewhat poor balance while walking heel-to-toe.  She had no difficulty getting on and off the examining table or lying down or sitting up.  Plaintiff complained of pain in the posterior aspect of the left thigh with range of motion testing of the back.  She complained of pain with muscle strength testing of flexion about the left knee and gave a poor effort to cooperate.  AR 339.  Her left leg strength was otherwise intact and rated at 5/5.

Dr. Gurdin diagnosed Plaintiff with cervical disc disease with one prior surgery, lumbar disc disease with a recent surgery and mild obesity.  Plaintiff appeared to be mildly stiff and sore in the lumbar area.  Dr. Gurdin noted there had been improvement in her neck complaints with the cervical surgery and he would expect further improvement with ongoing treatment.  Dr. Gurdin opined that Plaintiff could probably be on her feet for 1 ½ to 2 hours at a time and for 4 or 5 hours out of 8 hours being limited by the pain in the left thigh.  She appeared capable of sitting for 1½ to 2 hours at a time and for 5 or 6 hours out of 8 hours.  She probably could lift 15 to 20 pounds occasionally, 10 pounds frequently.  AR 340.

Dr. Gurdin also completed a partial Medical Source Statement of Ability to Do Work-Related Activities (Physical) form.  He opined that Plaintiff could sit 2 hours at one time, stand 2 hours at one time and walk 1 hour at one time.  She could sit 6 hours, stand 4 or 5 hours and walk 4 hours in an 8 hour work day.  AR 341.  She could use her hands continuously for reaching, handling, fingering, feeling, and pushing/pulling.  She could use her right foot continuously and her left foot frequently to operate foot controls. AR 342.  She occasionally could climb stairs, ramps, ladders or scaffolds.  She frequently could balance, stoop, kneel, crouch and crawl.  AR 343.  She occasionally could tolerate exposure to unprotected heights and vibrations.  She frequently could tolerate moving mechanical parts and continuously tolerate humidity and wetness.  AR 344.

On August 29, 2007, Plaintiff sought treatment from Christine Cormack, N.P., for foot pain.  AR 394-45.  An x-ray showed a healing fracture of proximal shaft of left fourth toe.  AR 377, 395.  A subsequent x-ray on October 9, 2007, showed considerable healing.  AR 375.

On October 18, 2007, Plaintiff sought treatment from Stacie Bohn, N.P., for complaints of a urinary tract infection and low back pain.  She was referred to a podiatrist for evaluation of her old metatarsal fracture.  AR 392-93.

On January 18, 2008, Plaintiff sought emergency treatment for back pain radiating to her lower left leg.  AR 372-73.

On January 20, 2008, Plaintiff sought emergency treatment for pain in her left foot.  AR 367-68.  X-rays were unremarkable.  AR 369.

On February 6, 2008, Plaintiff complained of increased pain radiating down her left leg with weakness.  Treatment notes reflected that she had 90% improvement of her symptoms following the October 2006 lumbar procedure.  AR 383.

An x-ray of the lumbar spine taken on February 19, 2008, was unremarkable.  AR 385. An MRI of the lumbar spine showed post laminectomy residuals at L5-S1.  She had L5-S1 posterior disc bulge/osteophyte with superimposed residual or recurrent disc protrusion, left posterior paramedian, encroaching on the lateral recess along with considerable scar posterior to this region. It was noted that these findings might affect the descending left S1 nerve root.  The MRI also revealed bilateral neural foraminal stenosis at L5-S1, mild on the right, but moderate to severe on the left most likely affecting the exiting L5 nerve root.  AR 386-87.

Plaintiff again complained of left leg pain on March 4, 2008.  She had a mildly antalgic gait.  She was noted to be taking Lyrica, Vicodin, ibuprofen and temazepam. AR 384.

ALJ's Findings

The ALJ found that Plaintiff had not engaged in substantial gainful activity.  AR 21.  She had the severe impairments of status post anterior cervical diskectomy and fusion on August 10, 2005, and status post lumbar laminectomy and diskectomy on October 6, 2006.  AR 21-22.  She retained the residual functional capacity ("RFC") to perform the full range of sedentary work. AR 22.  She could stand and/or walk four hours in an eight-hour workday in thirty minute increments and sit for six hours in an eight-hour workday in one hour increments with the need to stand (stretch, move) for up to five minutes.  AR 22.  She could not perform any past relevant

work, but there were jobs that existed in significant numbers in the national economy that she could perform.  AR 25.

## SCOPE OF REVIEW

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act.  In reviewing findings of fact with respect to such determinations, the Court must determine whether the decision of the Commissioner is supported by substantial evidence.  42 U.S.C. 405(g).  Substantial evidence means "more than a mere scintilla," *Richardson v. Perales*, 402 U.S. 389, 402 (1971), but less than a preponderance.  *Sorenson v. Weinberger*, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975).  It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson*, 402 U.S. at 401.  The record as a whole must be considered, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion.  *Jones v. Heckler,* 760 F.2d 993, 995 (9th Cir. 1985).  In weighing the evidence and making findings, the Commissioner must apply the proper legal standards.  *See, e.g.*, *Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988).  This Court must uphold the Commissioner's determination that the claimant is not disabled if the Commissioner applied the proper legal standards, and if the Commissioner's findings are supported by substantial evidence.  *See Sanchez v. Sec'y of Health and Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

## REVIEW

In order to qualify for benefits, a claimant must establish that she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than 12 months.  42 U.S.C. § 1382c(a)(3)(A).  A claimant must show that she has a physical or mental impairment of such severity that she is not only unable to do her previous work, but cannot, considering her age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.  *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989). The burden is on the claimant to establish disability.  *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990).

In an effort to achieve uniformity of decisions, the Commissioner has promulgated regulations which contain, inter alia, a five-step sequential disability evaluation process.  20 C.F.R. §§ 404.1520(a)-(g), 416.920(a)-(g).  Applying this process in this case, the ALJ found that Plaintiff: (1) had not engaged in substantial gainful activity since the alleged onset of her disability; (2) has an impairment or a combination of impairments that is considered "severe" (status post anterior cervical diskectomy and fusion on August 10, 2005, and status post lumbar laminectomy and diskectomy on October 6, 2006) based on the requirements in the Regulations (20 CFR §§ 416.920(b)); (3) does not have an impairment or combination of impairments which meets or equals one of the impairments set forth in Appendix 1, Subpart P, Regulations No. 4; (4) cannot perform any past relevant work; but (5) jobs exist in significant numbers in the national economy that she can perform.  AR 21-26.

Here, Plaintiff argues that the ALJ (1) failed to properly evaluate the opinion of her treating physician, Dr. Mensink; and (2) failed to properly evaluate Plaintiff's testimony.

## DISCUSSION

A.    Treating Physician

Plaintiff contends that the ALJ should have afforded the greatest weight to the opinion of her treating physician, Dr. Mensink.  The opinions of treating doctors should be given more weight than the opinions of doctors who do not treat the claimant.  *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir.1998); *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir.1995).  Where the treating doctor's opinion is not contradicted by another doctor, it may be rejected only for "clear and convincing" reasons supported by substantial evidence in the record.  *Lester*, 81 F.3d at 830.  Even if the treating doctor's opinion is contradicted by another doctor, the ALJ may not reject this opinion without providing "specific and legitimate reasons" supported by substantial evidence in the record.  *Id.* (quoting *Murray v. Heckler*, 722 F.2d 499, 502 (9th Cir.1983)).  This can be done by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings.  *Magallanes  v. Bowen*, 881 F.2d 747, 751 (9th Cir.1989).  The ALJ must do more than offer his conclusions.  He must set forth his own interpretations and explain why they, rather than the doctors', are correct.  *Embrey*

*v. Bowen*, 849 F.2d 418, 421-22 (9th Cir.1988).  Therefore, a treating physician's opinion must be given controlling weight if it is well-supported and not inconsistent with the other substantial evidence in the record.  *Lingenfelter v. Astrue*, 504 F.3d 1028, 1038 n. 10 (9th Cir. 2007).

As the ALJ found that the opinions of the State agency medical consultants were generally consistent with the objective evidence of record, the ALJ could not reject Dr. Mensink's opinion without providing "specific and legitimate reasons" supported by substantial evidence in the record.  *Lester*, 81 F.3d at 830.  Here, the ALJ rejected Dr. Mensink's opinion, stating it was not well supported by medically acceptable clinical and laboratory diagnostic techniques and was not supported by other substantial evidence of record.  AR 24.  In rejecting Dr. Mensink's opinion, however, the ALJ failed to provide a detailed and thorough summary of the facts and the conflicting clinical evidence.  The ALJ proffered only conclusions and failed to discuss or identify findings or treatment records from Dr. Mensink.  In the decision, the ALJ cited only a lone progress note from Dr. Mensink dated December 18, 2006.  AR 21.  While the ALJ stated that Dr. Mensink's opinion was not supported by the records of the claimant's other treating and consulting sources, the ALJ does not identify those sources or their findings.  AR 24. As such, the ALJ's failure to adequately explain the rejection of Dr. Mensink's opinion in favor of the State agency consultants is error.

B.    Credibility

Plaintiff also contends that the ALJ improperly evaluated her testimony.  The ALJ is required to make specific findings assessing the credibility of Plaintiff's subjective complaints. *Ceguerra v. Sec'y of Health & Human Servs.*, 933 F.2d 735, 738 (9th Cir. 1991).  "An ALJ is not 'required to believe every allegation of disabling pain' or other non-exertional impairment." *Orn v. Astrue*, 495 F.3d 625, 635 (9th Cir. 2007) (citation omitted).  In rejecting the complainant's testimony, "[g]eneral findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Lester,* 81 F.3d at 834 .

Pursuant to Ninth Circuit law, if the ALJ finds that the claimant's testimony as to the severity of her pain and impairments is unreliable, the ALJ must make a credibility determination with findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily

1   discredit claimant's testimony. *Thomas v. Barnhart,* 278 F.3d 947, 958 (9th Cir. 2002). "The

2   ALJ may consider at least the following factors when weighing the claimant's credibility:

3   '[claimant's] reputation for truthfulness, inconsistencies either in [claimant's] testimony or

4   between [her] testimony and [her] conduct, [claimant's] daily activities, [her] work record, and

5   testimony from physicians and third parties concerning the nature, severity, and effect of the

6   symptoms of which [claimant] complains." *Id.* (citing *Light v. Soc. Sec. Admin.,* 119 F.3d 789,

7   792 (9th Cir. 1997). "If the ALJ's credibility finding is supported by substantial evidence in the

8   record, we may not engage in second-guessing." *Id.*

9           In this case, the ALJ provided multiple reasons for finding that Plaintiff's statements were

10  not entirely credible.  As discussed below, however, the ALJ's reasons were not legitimate or

11  supported by substantial evidence.

12          First, the ALJ indicated that although Plaintiff's cash earnings did not rise to the level of

13  substantial gainful activity, they were inconsistent with the finding that she was experiencing any

14  significant work related limitations.  AR 24.  The ALJ does not identify the record evidence

15  supporting this determination or how Plaintiff's statements regarding her disability were

16  inconsistent.  Plaintiff testified that she last worked in early January 2005, which is not

17  inconsistent with her assertion of disability since January 6, 2005.  AR 32.

18          Second, the ALJ discounted Plaintiff's testimony because the objective medical evidence

19  did not show "pathology reasonably likely to cause the debilitating symptoms alleged."  AR 24.

20  Once a claimant produces medical evidence of an underlying impairment likely to cause the

21  alleged pain, the ALJ may not discredit the allegations of the severity of the pain solely because

22  the evidence does not support plaintiff's statements.  *Lester,* 81 F.3d at 834 (citing *Bunnell v.*

23  *Sullivan,* 947 F.2d 341, 343 (9th Cir. 1991)(*en banc*)).  In this instance, the ALJ does not identify

24  the alleged symptoms.  At the hearing, Plaintiff testified that she gets muscle spasms, cramping

25  and numbness in her left leg and has headaches.  AR 33, 41.  With regard to Plaintiff's left leg

26  complaints, the medical record contains a February 2008 MRI of the lumbar spine, which showed

27  an L5-S1 posterior disc bulge/osteophyte with superimposed residual or recurrent disc protrusion,

28  left posterior paramedian, encroaching on the lateral recess along with considerable scar posterior

to this region.  It was noted that these findings might affect the descending left S1 nerve root.

The MRI also revealed bilateral neural foraminal stenosis at L5-S1, mild on the right, but

moderate to severe on the left most likely affecting the exiting L5 nerve root.  AR 386-87.

As to Plaintiff's headaches, Dr. Mensink diagnosed Plaintiff with occipital neuralgia in

December 2006 following complaints of headaches.  AR 356.  An examination on February 14,

2007, revealed very sharp palpable tenderness of the occipital nerves, left greater than right, with

marked point tenderness of the occipital nerve insertions in the inner scalp.  AR 357.

Accordingly, the ALJ's indication that the objective medical evidence did not show pathology

likely to cause the symptoms is not legitimate.

The third reason proffered by the ALJ to reject Plaintiff's testimony was that her

treatment had been routine or conservative in nature.  AR 24.  Evidence of "conservative

treatment," such as a claimant's use of only over-the-counter pain medication, is sufficient to

discount a claimant's

testimony regarding severity of an impairment.  *Parra v. Astrue*, 481 F.3d 742, 750 (9th Cir.

2007).  In this case, the ALJ does not identify the conservative treatment at issue.  At a

minimum, however, the record reflects that Plaintiff twice underwent surgery.  AR 227, 286,

352-53.

Insofar as the Commissioner argues that the ALJ properly considered that Plaintiff's

treatment after surgery had been conservative, the Court is constrained to review the reasons the

ALJ asserts and cannot affirm on a ground not invoked by the Commissioner.  *Stout v. Comm'r*,

454 F.3d 1050, 1054 (9th Cir. 2006); *see also Barbato v. Comm'r of Soc. Sec. Admin.*, 923

F.Supp. 1273, 1276, n. 2 (C.D.Cal. 1996) (court may not accept post hoc explanations).  In this

instance, the ALJ did not indicate that the analysis was limited to the period after surgery or even

whether Plaintiff's surgeries were considered conservative treatment.

Fourth, the ALJ stated that the record reflects some gaps in treatment.  AR 24.  An ALJ is

permitted to consider lack of consistent medical treatment in assessing credibility.  *Burch v.

Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005).  However, the ALJ merely asserts a conclusion and

does not elaborate or identify the "gaps" in treatment.  The record reflects only brief, intermittent

breaks in treatment.  Occasional symptom-free periods are not necessarily inconsistent with disability.  *Lester*, 81 F.3d at 833.

Fifth, the ALJ stated that Plaintiff is not taking medications of a type and dosage consistent with her allegations.  AR 24.  Sixth, the ALJ reported that the record does not indicate that the claimant suffers from debilitating side effects from her medication.  AR 24.  In assessing credibility, an ALJ may consider the type, dosage, effectiveness, and adverse side effects of any pain medication.  Social Security Ruling ("SSR") 96-7p.  In this instance, the ALJ's statements are again conclusions without elaboration or citation to the record.  The record reflects that Plaintiff was not only taking pain medication, but that Dr. Renaudin testified that the muscle relaxers that Plaintiff takes can cause the type of sedation that she described.  AR 35-36, 48-49.

Seventh, the ALJ discounted Plaintiff's credibility because no treating or examining physician opined that Plaintiff was totally and permanently disabled from all work.  AR 24.  As a practical matter, the determination of whether Plaintiff is disabled is an issue reserved to the Commissioner.  20 C.F.R. § 416.927(e).  Further, the ALJ appears to overlook Dr. Mensink's opinion, rendered in March 2007, that Plaintiff could not work in a job that would require 8 hours a day, 5 days a week with regular breaks and a one hour lunch.  AR 262.

Eighth, the ALJ discounted Plaintiff's credibility because the record showed she was not following prescribed treatment.  AR 24.  A claimant's failure to seek or follow prescribed treatment is a proper basis for finding her allegations of disabling pain and other symptoms not credible.  *Bruton v. Massanari*, 268 F.3d 824, 828 (9th Cir. 2001).  In this case, however, the ALJ does not identify the prescribed treatment at issue.  The Commissioner attempts to elaborate on the ALJ's decision, stating that Plaintiff refused injection therapy.  Opposition, p. 8; AR 41.  The Commissioner's record citation demonstrates only that Plaintiff elected to wait and see regarding the injections and then they changed her doctor.  AR 41.  This is not an outright refusal to follow prescribed treatment.

Ninth, the ALJ noted that Plaintiff was still smoking tobacco despite her illness.  AR 24.  This is not a valid reason to reject Plaintiff's credibility given that she is complaining of issues unrelated to her tobacco use.  *See*, *e.g.*, *Shramek v. Apfel*, 226 F.3d 809, 812-13 (7th Cir. 2000)

(overturning ALJ's adverse credibility assessment for claimant's purported failure to comply with the prescribed medical treatment for failing to quit smoking without a finding that claimant's ability to work would be restored if she quit smoking).

Tenth, the ALJ discounted Plaintiff's credibility because she was able to participate in the administrative hearing and respond to the questioning without any apparent difficulties.  AR 24. Although it would not have been an error for the ALJ to base the decision partially on observations made of Plaintiff at the hearing, the ALJ has not identified other evidence supporting a determination that she is capable of performing other work.  *See Drouin v. Sullivan, 966 F.2d 1255, 1258-59 (9th Cir. 1992)* (ALJ's observations during the hearing, along with other evidence, constitutes substantial evidence); *Nyman v. Heckler, 779 F.2d 528, 531 (9th Cir.1986)* (ALJ's personal observations did not render decision improper where other evidence supported determination); *Perminter v. Heckler, 765 F.2d 870, 872 (9th Cir.1985)* (denial of benefits cannot be based solely on the ALJ's observation of a claimant).

As the eleventh and final reason for discounting the Plaintiff's testimony, the ALJ cited Plaintiff's daily activities.  If a claimant is able to spend a substantial part of her day engaged in pursuits involving the performance of physical functions that are transferable to a work setting, a specific finding as to this fact may be sufficient to discredit a claimant's allegations.  *Morgan v. Comm'r of Soc. Sec. Admin., 169 F.3d 595, 600 (9th Cir. 1999)*.  However, the ALJ must make "specific findings relating to [the daily] activities" and their transferability to conclude that a claimant's daily activities warrant an adverse credibility determination. *Orn,* 495 F.3d at 639 (citing *Burch*, 400 F.3d at 681).  In this instance, the ALJ did not make any findings of transferability.  The ALJ merely noted Plaintiff's statement that she can take care of her personal hygiene with help, does light housekeeping chores, does dishes with help and does some walking.  AR 22.

The Commissioner argues that there is evidence in the record that Plaintiff was malingering and this would be a sufficient reason to reject Plaintiff's complaints.  Opposition, p. 9.  Affirmative evidence of malingering will support an adverse credibility finding.  *See Robbins v. Soc. Sec. Admin., 466 F.3d 880, 883 (9th Cir. 2006)*.  Here, however, the ALJ does not cite any

1   affirmative evidence of malingering when discounting Plaintiff's credibility.  Again, the Court

2   may not accept post hoc explanations.  *Barbato*, 923 F.Supp. at 1276, n. 2.

3        C.   Remand

4        Plaintiff seeks a reversal and award of benefits.  Alternatively, Plaintiff requests

5   correction of legal errors.  Section 405(g) of Title 42 of the United States Code provides: "[t]he

6   court shall have the power to enter, upon the pleadings and transcript of the record, a judgment

7   affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or

8   without remanding the cause for a rehearing."  In social security cases, the decision to remand to

9   the Commissioner for further proceedings or simply to award benefits is within the discretion of

10  the court.  *McAllister v. Sullivan*, 888 F.2d 599, 603 (9th Cir. 1989).  "If additional proceedings

11  can remedy defects in the original administrative proceedings, a social security case should be

12  remanded.  Where, however, a rehearing would simply delay receipt of benefits, reversal and an

13  award of benefits is appropriate."  *Id.* (citation omitted); *see also Varney v. Sec'y of Health &*

14  *Human Servs.*, 859 F.2d 1396, 1399 (9th Cir.1988) ("Generally, we direct the award of benefits

15  in cases where no useful purpose would be served by further administrative proceedings, or

16  where the record has been thoroughly developed.").

17       The Court has determined that the ALJ erred in the evaluation of the medical opinions,

18  including that of Plaintiff's treating physician.  The ALJ also erred in the evaluation of Plaintiff's

19  credibility.  The Court finds that these errors can be corrected with further proceedings.  On

20  remand, the ALJ should provide a detailed and thorough summary of the facts and the conflicting

21  clinical evidence with citations to the medical record.  The ALJ also should adequately explain

22  the weight afforded to the medical evidence and opinions, including the opinion of Plaintiff's

23  treating physician, Dr. Mensink.  Additionally, the ALJ should make specific findings as to

24  Plaintiff's credibility supported by the record.

25                                   **CONCLUSION**

26       Based on the foregoing, the Court finds that the ALJ's decision is not supported by

27  substantial evidence and is therefore REVERSED and the case is REMANDED to the ALJ for

28  further proceedings consistent with this opinion.  The Clerk of this Court is DIRECTED to enter

1    judgment in favor of Plaintiff Joyce E. Walters and against Defendant Michael J. Astrue,

2    Commissioner of Social Security.

3        IT IS SO ORDERED.

4        **Dated:**   **May 10, 2010**          **/s/ Dennis L. Beck**
                                                UNITED STATES MAGISTRATE JUDGE